Our third and final case is 22-2075, Singleton v. Maryland Technology and Development Corporation. Mr. Eiler, whenever you're ready. Good morning, Your Honors. My name is Thomas Eiler. I'm representing Angela Singleton, plaintiff appellant, who appealed her decision from the United States District Court for the District of Maryland. This is a very straightforward matter, Your Honors. We're applying the ram-did-a-factors familiar to this court to a venture capital firm that was created by the State General Assembly in Maryland in or about, I believe, 1998. The Eleventh Amendment, Your Honors, protects two specific reasons or purposes. Protecting the treasuries of the various states from financial ruin out of the Revolutionary War and that second reason being protecting the integrity, dignity, and sovereignty of the states. Now, this court has found that from these two twin purposes comes out four factors for determining whether a state-created entity should enjoy the Eleventh Amendment sovereign immunity of the states, guaranteed to the states, and not to its political subdivisions or maybe lesser entities. Those four factors, Your Honors, are legal, functional liability, autonomy, statewide concern, and treatment under state law. Now, Your Honors, I don't want to belabor all four of these factors. The parties have found that really only three of these factors are in dispute as in the way in which they were applied to this entity and on these facts. This comes by way of a 12B1 motion, which I should note we believe is appropriate given the circumstances. Now, the three factors we'll be dealing with today are legal and functional liability, which we can further narrow to just functional liability. The parties are agreed that the legal liability of the Maryland Technology and Development Corporation is simply not at issue here. The lower court was correct in that assessment. So, really, we are only here to deal today with functional liability, statewide concern, and treatment under state law. And, Your Honors, what will become very clear, what I think is very clear from the treatment under state law, what is very clear by the statutes, the statutory construction, the case laws, the very limited case law at issue with this entity, is that the state of Maryland, there is no functional liability in this matter. There is no liability at all on the state treasury for Maryland in this matter. As I see it, Your Honors, what we're dealing with here is a situation in which there is simply no obligation by the state of Maryland to pay any judgment, any liability, any debt of the Maryland Technology and Development Corporation, which I'll assure you, Your Honors, and what is clear from the statutes incorporating this entity is that it is simply a series of funds that the state treasury will, on occasion, deposit money into these funds, which are then spent at the discretion of TEDCO. For a statewide concern, that being business development, but it is TEDCO who determines how those funds are spent. It is TEDCO who determines who it spends that money with. And this goes a little bit to the autonomous factor. So let me back up a little bit and deal strictly with functional liability. So there was a focus by the United States District Court below that there was no insurance that would protect this company and that that would potentially affect the state's obligation to come in and pay a judgment on its behalf should a judgment be levied against it. Just as it relates to this brief matter of insurance, I think that a quote from the Supreme Court in the Regents' matter is instructive. And I'll quote here, this is page 431 of the Regents of University of California v. Doe from the Supreme Court, that none of the reasoning in our, the Supreme Court's, opinions lend support to the notion that the presence or absence of a third party's undertaking to indemnify the agency should determine whether it is the kind of entity that should be treated as an arm of the state. Just thinking on this, I think what's clear and what the Supreme Court has made clear is that insurance simply doesn't matter in this situation. What matters is how is the entity structured? What matters is how much real financial material or substantial monies, I think is the term that I see a lot reiterated in the case law, what financial information is there present in the entity? Can I ask about that? Doesn't the state fund TITCO's operating budget? I believe that the state does fund the operating budget. And doesn't it pay its employees? And doesn't it provide legal counsel to the entity? Interestingly enough, Your Honor, there's also the existence of this enterprise fund, which I think we need to take into account. I don't know the answer to my question, so it's yes, yes, yes to those three? I believe the answer is yes, qualified, Your Honor, with that. The but is they also have the ability to pay this money out of millions of dollars in separate funds. They call them special funds. One of these is the enterprise fund, which statutorily they are permitted to pay operating costs, legal expenses, actuarial expenses. Why do you think you seem to make the assumption? I don't know why this is super important, but you made the assumption. It seems odd to me that legal expenses include paying a judgment. It doesn't. When I read that provision of the enterprise fund, it doesn't at all suggest to me that it involves paying a judgment. And when I sort of did a little bit of work on it, it doesn't look like the case law or dictionaries or anything else would suggest that legal expenses in that context is satisfying a judgment. So not sure that's crucial. But why should I think that, you know, actuarial accounting and legal expenses means paying judgments? Well, Your Honor, I think in one sense, a legal expense came to mind as including that term. I think maybe more traditionally, we may expect it to simply include fees, costs and other things. But I think as well, a legal expense of an entity would include a judgment that necessarily. What's the best support you've got for reading legal expenses to be something other than legal expenses, but also judgments? I think, Your Honor, that it's the plain reading of the statute in conjunction with the fact that there is no. Would be inclined to go the other way, it seemed to me. I mean, a Ford Motor Company had a design defect and got hit for 50 million dollars. You think that's called a legal expense? Appropriately, Your Honor, I think it might depend who you ask. But I think for this court, and I think maybe maybe let's ask some judges and see what they say. Sounds like to me it's not. I would disagree that it is absolutely foreclosed that a judgment is not a legal expense. But putting that fact for a side, just for a second, we also have the existence of this reserve fund. Twenty two million plus dollars with no statutory restriction, no statutory prohibition. Quite frankly, it's just 22 million dollars. So can I ask you about that? So it's it's used to supplement the money that comes from the state. Right. And well, I mean, that's just what they say they do. Right. So each year they're supplementing. But you say there are no restrictions on it. But it seems to me that it includes lots of buckets that are restricted. Right. So, for example, the the first line of revenue, the MII university contributions. Right. That's part of the reserve fund. But we know by statute that that is also part of the innovation initiation fund. Right. Because all university contributions are part of the innovation initiative fund. Right. So it's not unrestricted at all. In fact, that's like specific to a fund. If we go through each of the lines, many of them are part of other funds. Right. The revenues here. This is like a catch all bucket that's being described. But it doesn't seem like it's a standalone fund at all. Can you can you help me understand? You say there are no restrictions. Seems like to me there are quite a few restrictions. Absolutely. Now, my understanding of the reserve fund is all we have before us. It's what's clearly in the record. And my understanding is what I'm looking at in the reserve fund are line by lines, revenue coming into the reserve fund from specific sources. But the reserve fund was not codified, was not created by statute. The reserve fund is not created by regulation. The reserve fund merely exists. And as you noted, Your Honor, that there are many portions of that fund. I apologize. I'm not looking at that particular page of the joint appendix. I'm working up my memory here. But there are going to be lines there that are not tied to these specific funds. And some are. You acknowledge that some of them are. There might be, Your Honor, but my thinking through this is. Why might be? Why are you hedging that? The reason why I just want to I don't understand. I'm not I'm not trying to critique you. I'm just saying you hedge it. That makes me think that that matters, that if they did so, are there or they're not. My understanding, Your Honor, again, just based solely on this record, this is where this money comes from. But where is it earmarked for? Would be, I think, a larger question that I'm not sure is necessarily answered in the statutes creating these funds. For instance, for a lot of these funds, the. I'm forgetting the financial term, but the money that's coming in the door is can be credited back to the fund, which might be what they're doing with this so-called reserve fund. But the way I read it is simply that they are putting this money in a segregated account, separate and apart from the general funds where the fund should be credited to. Instead, it's being put in a completely separate box far and away from the general funds, which are also needed to be accounted for in a completely different manner by statute. For instance, in certain situations under some of these funds, they need to be accounted for by the state treasurer, a comptroller, some other individual. What I don't see with the reserve fund is that money may be coming in the door one way. But where is it being held? How is it being held? By what purpose is it limited to be expensed or used? They aren't using it for expenses. In that page, I'm sure, Your Honor, that you referenced to me just recently, it also has expenses. Where are those expenses coming from? It doesn't say that the MII expense is coming from the MII money that came into the reserve fund. Well, it's the exact same number. I mean, it looks pretty obvious that the university contributions under the MII program happens to be the exact same amount that is the MII program in the expenditures. Yes, Your Honor. So, I mean, I guess it's not obvious, but it seems obvious. And I think that that, you'll forgive a cautious mind, seems obvious is not where I want to deal. And I think that in my mind, I don't know where this money is going. But what I can see is that there are $22 million that don't seem to have any statutory strings. There's no prohibition. There's no exemptions or exceptions related to the reserve fund. There is money coming in the door. It's sitting there. But further, Your Honor, I may want to take a step back away from simply the real financial information. So, is your position that the reserve fund is effectively just like a part of the general operating budget? I think that it may be able to be used like that. I would argue that the enterprise fund absolutely could be used in that way. I would argue that the enterprise fund is statutorily… We're not talking about the enterprise fund. I think you're wrong about the enterprise fund. So, bracket that for a minute. I mean, you can bring it back in if you want to. But we were talking about the reserve fund. Yes, Your Honor. And so what I'm asking is, is your position that the reserve fund is effectively like a part of the operating budget? It's just the carryover portion. I believe that it can be used like that. Yes, Your Honor. Now, Your Honor, I do want to kind of get away from, and I apologize, the financial information just for a second and talk a little bit about functional liability a little bit more generally, a little bit more about what exactly is functional liability. We found that there's no legal liability in this case. Everyone can agree on that. There is no legal liability for the state of Maryland. They've explicitly disclaimed the debts, obligations, and expenses of TEDCO. Now, what I find is interesting in our case law, Your Honors, is that the functional liability, and I have to apologize. I see that we're getting closer, so I will move a little bit. To borrow a term or phrase from the Third Circuit, there's no gun to the head of Maryland to pay a judgment by TEDCO. It would only be a matter of convenience. Obviously, there is a grant, not a true appropriation, that is going to this venture capital firm. But the decision by Maryland to swoop in, this is not a situation like Hutto, where the, I believe, North Carolina Supreme Court stated that if the retirement system runs at a deficit, the state must come in and finance the company. That's just simply not present in this case. There is no gun to the head situation, and the agency is not so structured that for it to survive. Well, I think in a larger context, this fund or these funds were created in the interest of the state, building up enterprises and businesses and increasing the economy of the state. And it was initially funded entirely by the government, and some of the funds were seed-type things where they would invest in somebody they brought from the state and take an interest back, and that's some of the income coming. But it's pretty clear that the legislature intended this to be the direct and serious operation of the state, and I don't think they would ever let it drop. I mean, they actually say that the corporation is a body politic and corporate and is an instrumentality of the state. Yes, Your Honor. And they have an important state purpose that they're carrying out. So the question I have is, you know, when all of a sudden this is an important purpose that we fund every year and you get a big judgment against it, if the state wants to continue, it's going to have to fund it again. It's going to be using state monies to fund this thing. This operation is not self-sufficient. And I think I'd like to address that point, if I can, just by referencing the Oberg series of cases that this court dealt with, Obergs 1, 2, and 3. I'll focus mostly on Oberg 3, as I find it to be the most instructive of the three cases. Now, in one sense, I just want to state as to the state instrumentality language, the Pennsylvania, I believe it's the Pennsylvania Higher Education Assistance Agency, that was at issue in that matter, had the exact same language in the statute, the exact same language in its enabling statute, that it is a state instrument. So we should discard it because some court discarded it? This court discarded it, Your Honor. I understand. And I believe that the way to think through it is something that's come up as a theme, I think, throughout today, which is that we're not dealing with labels. We're dealing with the actual facts on the ground, or maybe more materially, the legal structure of this agency. And something as well as that it was initially funded by the states, I would still say that it is drawing some funding from the state. I would point again to the Enterprise Fund, which disclaimed its grants on the budget proposal, I believe, that the court has in its possession in the joint appendix, in or about pages 40. But there's also something that's dealt with in Hess and Oberg 3, which is the anticipated financial independence of these entities. And here, I think this agency, or apologies, but this entity is structured in such a way that it could be financially independent. I believe that it is financially independent if it were to determine to use the monies at its expense, the substantial monies that it has in its reserve fund, the substantial monies that it has in its Enterprise Fund. And I apologize, Your Honor, I see that I've exceeded my time. Thank you. Thank you, Mr. Isla. You've got some time left for rebuttal. Mr. Chazen or Chazen? Go ahead. Good morning, Your Honors. May it please the court, Joshua Chazen on behalf of the Maryland Technology Development Corporation. This case is not a matter of first impression. For almost 40 years, this court has analyzed whether state agencies and instrumentalities of a state are entitled to 11th Amendment immunity under the four-factor test, which my learned colleague described to you from RAMDIDA. This matter focuses on TEDCO. It's a corporation created by the state of Maryland to help build Maryland-based technology companies and help commercialize the results of scientific research and development by colleges, universities, and federal research institutions in the state. The case put forward today by the appellant asks whether the district court correctly dismissed the lawsuit by Ms. Singleton against TEDCO because TEDCO is an arm of the state and therefore has 11th Amendment immunity. This court should answer that question in the affirmative, thereby affirming the decision of the district court because TEDCO satisfies all four factors of the RAMDIDA test. The first, which is the most prominent, is whether the state treasurer will be responsible for paying any judgment. And if that factor favors the state, or in this case TEDCO, that is dispositive. If it favors Ms. Singleton, we then go to factors two through four. And I think that's an important distinction as we look at legal liability and functional liability. Legal liability is not called into question in this case because of the economic development statute. That's section 10-411. I think that's clear. But that only deals with legal obligation. We look at functional obligation, and the state is functionally liable for the obligations of TEDCO. Maryland does not give TEDCO a mandatory obligation to pay legal expenses, which in TEDCO's position does not include satisfaction of judgments. I don't believe there's any authority cited by my colleague on the other side that it is. Legal expenses would really refer to, you know, if you need to hire an expert in a case. That would be a legal expense. So can you help me on that? Because I noticed in your brief, you punted on this question, right? You said whether or not that allows satisfying legal judgments or something to that effect, right? You know, the government is very careful with their words. You are very careful with your words, and we appreciate that. But you punted on that, which is the only thing that gave me pause, right? When I read it, it seemed very clear. The work I did on it suggests it's very clear. But the fact that the state of Maryland punted gave me some pause. Can you help me understand? Yes, Your Honor, and the specific language from the briefing is which may or may not include legal judgments. So I do know exactly what you're pointing to. There is a distinction. There is no authority in Maryland law that we can find that legal expenses include satisfaction of judgments. They're two separate buckets. But in this case, we're before the Fourth Circuit. We spent a lot of time researching, but the punting has more to do with that we're in the Fourth Circuit dealing with that authority. We know this court is analyzing Maryland law. But it's my job as the brief writer to be a little bit cautious if I haven't researched an issue thoroughly. Based on the subsequent research, I can't find any authority. If there was authority, I would have expected counsel to cite to it in the reply briefing. And there's a lot of talk today about the Enterprise Fund, and I want to describe that a little bit. It's in the briefing, but it's one of numerous funds that TEDCO serves or services. It's, in fact, the only fund, as counsel points out, that permits TEDCO to use fund assets to pay for legal expenses. It's held by the treasurer. It's accounted for by the comptroller. That's in the economic development article at 10-46092. Unlike the PHEAA, which is part of this Oberg trilogy, a judgment against TEDCO puts state funds at risk. That is unqualified. This is not the PHEAA that didn't receive appropriations for many years before that judgment potentially was going to be levied on it. TEDCO receives an appropriation from state funds every year. Last year, in fact, for fiscal year 2024, and it's not cited in the briefing. The court below relied on this, and it's in the joint appendix from 41 to 53 about fiscal year 2023. The updated document at fiscal year 2024 shows that the state actually increased its funding to TEDCO. And that percentage was by 39.5% or another $15.5 million. And if TEDCO had this ability to solely operate on its own like the PHEAA, the state wouldn't have to fund it. In fact, the state isn't required to provide appropriations to TEDCO in any way. But those numbers increase. And when we look at the specific things that TEDCO does, the key purpose of the enterprise fund, which is also known as the Maryland Venture Fund, it was done by the Department of Commerce. Ultimately, in the mid-2010s, it shifted to TEDCO, but it's still a state-operated arm. The fund is still state-funded and state-operated. It deals with, as it's described in the joint appendix, capital through equity and convertible debts. Part of this funding does get invested by TEDCO directly, but a portion is invested by private venture capital funds on behalf of the state. And for that, any returns are remitted back to the state's general funds. So we have these buckets of money. I mean, to me, it's just follow the path of where the money is coming from. You have money that is directed by the state to go to TEDCO like any other state agency or instrumentality. Those monies get invested, and money cycles back. Now, some of the money stays with TEDCO, and that's the reporting that gets done by TEDCO. It's subject to audit. It has to account for these funds. It can't just, as counsel seems to imply, fund whatever it wants or do whatever it wants with the money. The statutes are very clear about what it did. Can you talk a minute about what is the reserve fund? Because the enterprise fund, we've got a statute and all kinds of things that tells us what it is. The reserve fund seems a little more oblique. That's right, Your Honor. It's not as statutorily defined. It might not be oblique, but when you look at Joint Appendix page 46, it describes the reserve fund and then shows the chart. But from what it shows is that it's really just another accountability metric. It's so when TEDCO is proceeding before the legislature or seeking additional state funds for an upcoming fiscal year, it's accounting for what it's being held for. And as Your Honor pointed out in the questioning, it deals and lists out specifically the expenditures that it's going to specific funds. The reserve in TEDCO's summation is it's this funding that can be used to help push money into the other funds so that the Maryland Investment Vehicle helping entrepreneurs show up in the state of Maryland can be appropriately funded. That way you don't have to have Fund A specifically putting money into Fund B, which, in fact, it's not allowed to do under the statutes of those funds. So it's basically bottling these funds for distribution. And Exhibit 3, the chart that's on JA-47, that helps explain it. It derives all of its revenue from the reserve fund, and it also delineates these expenditures, which mostly go to funding. There's one listing that's a symposium. I believe that the statute allows funding to be used for events. There's also administrative support. I don't have a clear line item as to what administrative support is, Your Honor, but I think it's really just paper, anything that is really administrative. I'm not sure this really matters, but can you help me understand? So it describes 46, the assets of the reserve fund, so sort of the beginning balance, which is not revealed here. But those are the market value of securities. That's the stuff that Tedco's invested in, the Maryland companies that are doing TAC. That's right, Your Honor. That's what they're holding year after year. That's right, Your Honor. And I think it's important also to remember what Tedco is doing. It's providing grants to entrepreneurs and individuals throughout the state of Maryland. So this isn't a selective project. What Tedco is doing— Is it just providing grants, or is it also making investments? It's doing both, Your Honor. Because that's what I'm trying to get at. So the 22.8, that's the—you know, in 2023, that's the beginning balance. The numbers don't matter, right? It says the balance represents the market value of the securities. Those are the securities that they invested in as part of their mission. Is that right? That is right, Your Honor. That is correct. And so when we look at this first factor under RAMDIDA, it is very clear that it favors the state. It's not the PHEAA, which had hundreds of millions of dollars at its disposal and wasn't receiving any operational funding from Pennsylvania. That's at Oberto, the pin site 139. It's also not PATH, the Port Authority Trans-Hudson Corporation described in Hess by this court. TEDCO is not structured to be self-sustaining. That's not what TEDCO is. It is an investment vehicle for Maryland to run and operate. TEDCO doesn't have billions in net assets. It doesn't have over half a billion dollars in reserves. It is not a bi-state compact to—for lack of a better phrase. But the financial information relied on by the district court and contained in the joint appendix highlights that Maryland retains the liability to bear and pay any resulting indebtedness from satisfaction of judgments. Now, in the event this court disagrees with me and says that factor one favors Ms. Singleton, we still have the opportunity to look at the three remaining factors. As my colleague on the other side indicated, what's listed as the third factor in the RAMDIDA test, there's no controversy. It clearly favors the state. TEDCO is a statewide pursuit. The second factor in the four-factor test deals with autonomy. As this court said in Cash v. Granville Board of Education, the court must be satisfied that the relationship between the government entity and the state is sufficiently close to make the entity an arm of the state.  The clear legislative intent from the creation of TEDCO is that it was created as an instrumentality of the state. So we can see what the legislature intended to do. It's not a dispositive factor. Happy to concede that. Other cases show that this court has found not functional liability with that being a part of the statute. But these other cases that find against the state or the entity being an arm of the state, they don't have these other factors that TEDCO has. Maryland retains control and ownership over the operations of TEDCO. That's at Economic Development Article 10-415. TEDCO's 19-member board of directors comprises of not only the Maryland Secretary of Commerce, but 14 government-appointed members, two Maryland Senate President-appointed members, and two Maryland Speaker of the House-appointed members. The governor can remove his or her appointed members for incompetence, misconduct, or failure to perform at any time. That's at 10-403-H2. TEDCO must provide annual reports to the state, and Maryland can audit TEDCO whenever it wants. This is not free-flowing money, and the legislature gives the write-off, the governor gives the write-off, and says, TEDCO, go do your thing. Everything is very clearly statutory delineated. It's true that TEDCO can enter into contracts. It can sue and be sued. That's why I'm here today in part. It can acquire and sell property, but it receives appropriations from the state. It has no ability to tax, and it receives representation in legal matters from the Maryland Office of the Attorney General. Now, there's a point being made in the briefing, and I believe it was brought up briefly today, that OAH, Maryland's Office of the Attorney General, doesn't have to represent. That's true, but the Office of the Attorney General is the legal counsel for TEDCO. It assigns assistant attorneys general directly to TEDCO to represent it. It appoints a general counsel of TEDCO, which is an assistant attorney general of the state. TEDCO cannot go and enter contracts with other legal counsel without getting the express blessing of the Office of the Attorney General to do so. Now, this is no different than how actual state agencies operate. We see from time to time that the Office of the Attorney General, whether it's because of a conflict or it needs a specific area of expertise, will hire outside counsel. In fact, the Maryland Department of the Transportation right now, they're seeking requests for proposal because they need expert advice that the OAG office doesn't currently have in that area. And so these are not minor strains when you add up the sum of its parts. It's major control. It's not an autonomous entity. And TEDCO does not exercise a significant degree of autonomy. The final factor, Maryland very clearly treats TEDCO like a state agency. The Maryland legislature, as I pointed out, intended TEDCO to be an instrumentality of the state. State personnel includes employees and officials at TEDCO under the Maryland Tort Claims Act. I think that's a very important feature. It shows that the employees who are in charge of running TEDCO are subject to the same laws that any other state official would be subject to. And that is an important fact. It defeats Ms. Singleton's assertion that TEDCO is akin to the Northeast Maryland Waste Disposal Authority. That entity finds itself defined rather under the local government Tort Claims Act as opposed to the MTCA. And much like the Maryland National Park and Planning Commission, which stems from the Ramditta case, TEDCO is not focused on a specific subset of the state. It's not focused on the Northeast part of the state. It's not focused on Montgomery County and Prince George's County, Maryland. It covers everywhere, in economic development everywhere, and through the public universities of the state, which are located throughout the state. And if there are no further questions... Can I ask just one? Absolutely, Your Honor. You call this entity the Maryland Technology Development Corporation. The plaintiff calls them the Maryland Technology and Development Corporation. I assume you're right, because you're the entity. But is there an and in the name of TEDCO? There's not, Your Honor. Part of the features of the Joint Appendix, particularly the legislative packet that I've pointed out for 23 and 24, clearly defines TEDCO as the Maryland Technology Development Corporation. We just want to get the name right. Absolutely. It's not crucial, but... It's important to do that. And so, for the foregoing reasons, TEDCO respectfully requests that the Court affirm the judgment of the United States District Court for the District of Maryland. Thank you. Thank you, Counsel. Mr. Euler? Thank you, Your Honor. I want to focus a little bit on these... I will call them. They are minor strengths of state control. At the administrative edges of TEDCO, rather than the discretionary and substantive heart of its operations. We talk about reporting requirements. We talk about audits at any time. This Court has had no problem in the Oberg series of cases calling those minor strengths. In fact, it very explicitly did so that reporting to the Governor and the General Assembly is a minor strength. And it defined what it meant by that. It tried to wrestle with that term. And it came out that what a minor strength is, it operates at the administrative edges of the entity rather than its discretionary heart. And the discretionary heart of this venture capital firm is that it invests in companies. It chooses how it invests in its own companies. It chooses the companies that it invests in. It is not told by the State of Maryland, the General Assembly. While there may be general themes when funds are created and transferred to the Maryland Technology and Development Corporation. As we know, names are important. But the situation that we are describing, these are minor strengths. This is nothing greater. Does the Board control the investments? Do you think the Board has involvement in the investments? Well, Your Honor, they create an investment committee that will come out and deal with the investments more directly. As every Board does, right? The Board doesn't run every detailed operation. That's what a Board does, right? But you'd agree the Board has the ability to influence and control the investments. I think to one degree or another, I think it comes down to the honesty of the investor who is making the decisions of where the money goes. I think the Board is ultimately responsible. Without that being what? Because it's obviously a state employee that's doing it. But that decision, in your view, needs to be made by the Governor? They need to decide what entities to invest in? The Governor himself? I guess we're attacking a hypothetical situation in which would that be considered something that goes to the discretionary heart of the entity? I think that it need not go that far. I think maybe in a hypothetical scenario where we're dealing with a General Assembly that determines that these are the investments we're going to do, we're going to regulate it ourselves, or the Department of Commerce will regulate your investments. Maybe there's something there, but that's just not the situation here. I thought they were limited to investing in qualified corporations, and they have to provide a list to the state on a regular basis. Yes, Your Honor, they do provide, I believe, the list. My recollection, based on the statutes, is that they provide it? It's not as so open field. In other words, they have a purpose they're carrying out for the state. It's not this idea that they can just go around and invest to make money for themselves. What qualifies a corporation is whether it advances the purposes of the statute. And I think, Your Honor, under the regulations, they can define or at least clarify or expand the definition of what is a qualified business. That's my understanding as I sit here today, that they can make that sort of determination and use that definition. They may report, again, who they're investing money with, but the determination of who they invest money with is ultimately at the core discretion of this venture capital firm. The state appoints the board? The state appoints certain members of the board. It gets a little bit hazy. All but two, right? I believe all but two. The governor appoints some. The House appoints some. I understand, but it seems to me that the idea of where they're spending their money and so forth is right under the state finger. Under the state finger, but not under the state's control, Your Honor. You're basically saying the board doesn't have control, and I don't think anything suggests that. The board is a board of directors. Absolutely. I agree that the board is a board, Your Honor. Now, I would like to point out as well that the employees or state employees was something, Your Honor, that I believe you just brought up, Judge Richardson, that these are state personnel. They're not. They're explicitly exempted from the state personnel article in Maryland. We have as well, I think, some guidance from, and my learned colleague brought this up. I think that we do have this regulation from former Governor, ex-Governor Hogan, in which he identified the Maryland Technology Development Corporation as a quasi-government agency, listing it alongside a list of 14 other agencies, and commanded a committee be put together to investigate the structure of this agency. The other agencies he compared it to, again, as my colleague pointed out, one of these is this Northeast Waste Disposal Authority in Maryland, and that's under the Local Government Tort Claims Act. There's a direct comparison being made to a political subdivision as well as this venture capital firm, and that's what it is. The autonomy that is enjoyed by TEDCO is the same level as the political subdivisions of the state of Maryland. Whatever level of control there might be, it's that same level of control that we qualify as a minor string or as a background level of control that the political subdivisions enjoy. Though it wasn't brought up, I do want to bring up this issue of the control of the governor, specifically as it relates to veto, as it relates to his control of the board. One, this is a potential ability that can be used, but again, I think that it is part and parcel of this minor string. There's a quote that comes, I believe, from either Regents or Hess that the state may destroy any political subdivision or unit that it creates, and yet cities and counties do not enjoy 11th Amendment immunity. An interesting fact here is that the Maryland legislature actually created the Archdiocese of Baltimore, but I don't believe that there would ever be a serious argument entertaining that the Archdiocese of Baltimore enjoys sovereign immunity under the 11th Amendment. The reason I bring this up, Your Honors, is simply to state that, again, this entity is autonomous. The state of Maryland will create autonomous entities from time to time. It will create entities which it does not have any liability for, any legal or functional liability, and we all can agree there is no legal liability here. I would point out again that there is no gun to the head of the state of Maryland to pay Tedco, as my learned colleague just admitted and described here in his argument, that there is no obligation. Now, I apologize, Your Honors. I see that I've run over my time. Thank you very much. Thank you, Mr. Eiler. Thank you both for your arguments. We appreciate them. We'll come down and recouncil and adjourn for the day. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Albert Diaz, Paul V. Niemeyer, Julius N. Richardson